**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 6:20-cv-00372 |
| STEVEN J. BRANSFIELD, individually and as a principal and sole owner of SB & A Media, Inc., SB&A Group, LLC, and WeRunAds, LLC; | |
| SB & A MEDIA, INC., a Florida corporation; | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| SB&A GROUP, LLC, a Wyoming limited liability company; | |
| WERUNADS, LLC, a Wyoming limited liability company; | |
| GAR LEONG CHOW, a/k/a JOHN CHOW, individually and as a principal and sole owner of TTZ Media, Inc.; | |
| TTZ MEDIA, INC., a Canada corporation; | |
| SCOTT A. ZUCKMAN, individually and as a principal and sole owner of Alpha Quad Enterprises, Inc.; | |
| ALPHA QUAD ENTERPRISES, INC., a Nevada corporation, | |
| Defendants. | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief,

rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of

ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## SUMMARY OF THE CASE

2.    Defendants operated as high-ranking affiliates of a fraudulent online coaching

program and investment opportunity scheme called "My Online Business Education" or

"MOBE."   Since 2013, the perpetrators of the MOBE scheme defrauded tens of thousands of

consumers—for over $300 million—by claiming to offer a simple 21-step system that

consumers could use to start their online marketing business and generate substantial income.

Contrary to these representations, most consumers who purchased MOBE products did not

make substantial income and instead suffered devastating financial losses or crippling debt.

In early June 2018, the FTC commenced an enforcement action against the MOBE enterprise

and its principals and obtained a temporary restraining order to halt the scheme.  *FTC v.*

*MOBE et al.*, No. 18-cv-00862-RBD-DCI (M.D. Fla.).

3.    In numerous instances while the MOBE program was in operation,

Defendants made similarly deceptive earnings claims to recruit consumers into the MOBE

program and used deceptive marketing and sales tactics to sell costly MOBE memberships

and mentoring services to consumers.

4.    Defendants received millions of dollars from MOBE as a reward for

proliferating the deceptive MOBE scheme and bringing more consumers into its fold,

resulting in tens of millions of dollars in consumer harm.

5.    By this action, the FTC seeks to prevent Defendants from exacting further

consumer harm, disgorge the revenues Defendants obtained through their illicit activities,

and provide redress to victims that collectively lost more than $300 million to the MOBE scheme.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.      Venue is proper in this District under 28 U.S.C. § 1391 (b)(1), (b)(2), (b)(3), (c)(1), (c)(2), (c)(3), and (d) and 15 U.S.C. § 53(b).

## PLAINTIFF

8.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

9.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. § 53(b).

## DEFENDANTS

10.      Defendant Steven J. Bransfield, Jr. ("Bransfield") is a Florida resident and the principal and sole owner of SB&A Group, WeRunAds, and SB&A Media (collectively, the "Bransfield Entities").  Bransfield formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Bransfield Entities.  Bransfield, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

11.      Defendant SB & A Media, Inc. ("SB&A Media") is a Florida corporation

formed in June 2016, with its principal place of business in Miami, Florida.  SB&A Media transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

12.    Defendant SB&A Group, LLC ("SB&A Group") is a Wyoming limited liability company formed in April 2017, with its registered business address in Los Angeles, California.  SB&A Group transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

13.    Defendant WeRunAds, LLC ("WeRunAds") is a Wyoming limited liability company formed in October 2017, with its registered business address in Los Angeles, California.  WeRunAds transacted business in connection with the matters alleged herein in this District and throughout the United States and dissolved its corporate status in December 2018.

14.    Defendant Gar Leong Chow a/k/a John Chow ("Chow") is a California resident and the principal and sole owner of TTZ.  Chow formulated, directed, controlled, had the authority to control, or participated in the acts and practices of TTZ.  Chow, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

15.    Defendant TTZ Media, Inc. ("TTZ") is a Canadian corporation formed in British Columbia in 2006, with a registered address at 1130 Garden Drive, Vancouver, BC V5L 4P9.  TTZ transacts or has transacted business in connection with the matters alleged herein in this District and throughout the United States.

16.    Defendant Scott A. Zuckman ("Zuckman") is a Texas resident and the principal and sole owner of Alpha Quad.  Zuckman formulated, directed, controlled, had the

- 4 -

authority to control, or participated in the acts and practices of Alpha Quad.  Prior to MOBE,

Zuckman promoted business coaching and investment opportunity programs, including live

event seminars arranged by a company called Wealth Intelligence Academy.  During the time

he was promoting MOBE, he presented at live events for Sellers Playbook, a deceptive

business opportunity scheme that was shut down after the FTC filed suit against Sellers

Playbook in August 2018.  *FTC v. Sellers Playbook, et al.*, No. 18-cv-2207 (D. Minn.).

Zuckman also served as a paid speaker for Zurixx, a deceptive real estate investment scheme

that the FTC sued in October 2019.  *FTC v. Zurixx, LLC, et al.*, No. 19-cv-00713 (D. Utah).

Zuckman, in connection with the matters alleged herein, transacts or has transacted business

in this District and throughout the United States.

        17.    Defendant Alpha Quad Enterprises, Inc. ("Alpha Quad") is a Nevada

corporation with a registered place of business at 3225 McLeod Drive, Suite 100, Las Vegas,

Nevada.  Alpha Quad transacts or has transacted business in connection with the matters

alleged herein in this District and throughout the United States.

## **COMMON ENTERPRISE**

        18.    Defendants WeRunAds, SB&A Group, and SB&A Media (the "Bransfield

Entities") operated as a common enterprise while engaging in the deceptive and unlawful

acts alleged herein.  The Bransfield Entities conducted the business practices described

herein through an interrelated network of companies that have common ownership, business

functions, employees, and office locations.  The Bransfield Entities have commingled funds

and are each controlled and dominated by Bransfield or others acting at his behest.  Because

the Bransfield Entities have operated as a common enterprise, each of them is jointly and

severally liable for the acts and practices alleged herein against the Bransfield common

enterprise.

19.     Defendant Bransfield formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Bransfield common enterprise.  The Bransfield Entities and individual defendant Bransfield are collectively referred to herein as the "Bransfield Defendants."

## COMMERCE

20.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

**A.      Defendants' Role in the MOBE Scheme**

21.     Defendants operated as high-ranking "affiliates" of MOBE, a fraudulent coaching program and investment opportunity scheme that Matthew Lloyd McPhee ("McPhee") started in 2012.

22.     MOBE purported to provide free or relatively cheap training programs that would teach consumers how to make money on the internet.  To this end, MOBE offered a 21-step course and live event seminars called the "Internet Marketing Freedom Workshops" (or "IMF Workshops") and the "Home Business Summits" (or "HBS").

23.     The 21-step course consisted of a series of pre-recorded videos narrated by McPhee and "coaching" sessions with MOBE's sales agents.  The 21-step course and the live event seminars were essentially sales platforms used to sell MOBE's core product offerings—the MOBE memberships and mentoring services.

24.     The MOBE memberships had the following levels with different price tags—

Silver ($2,497), Gold ($4,997), Titanium ($9,997), Platinum ($16,667), and Diamond ($29,997).  Prior to 2016, MOBE called its entry-level membership package the "MOBE Licensing Rights" or "MLR" and charged consumers $1,997 for this membership.  MOBE discontinued the MLR in 2016 and replaced it with the costlier Silver membership.

25.    MOBE told consumers who purchased these membership levels that they would earn a 40% to 50% commission when they brought referrals into the program and their referrals purchased the same MOBE membership levels from them.  The membership levels were progressively tiered such that in order to pay and become a MOBE Diamond member, consumers must first pay for the Platinum membership; in order to reach the Platinum level, consumers first pay for the Titanium membership, and so forth.

26.    MOBE also sold mentoring services that cost anywhere from $5,000 up to $100,000 per package.  MOBE often pitched the mentoring services to consumers who had spent up to $60,000 to upgrade to the Diamond level memberships and were still unable to make money.

27.    The MOBE enterprise relied extensively on its high-ranking affiliates—especially the named Defendants—to promote the MOBE program and find more buyers for its core products.

28.    To this end, MOBE regularly announced its top affiliates' monthly commissions in marketing materials—called "MOBE consultant leaderboards"—to convey the false message that the MOBE program worked and that "regular" people were making substantial income through MOBE, as illustrated below:

**Leaders In Total Monthly Sales In January**

We started the year with a strong January and are nowhere near to slowing down. In fact, 2018 promises to be an even more epic year than the previous one. Thanks to your support, we have a big future ahead, and each of your achievements has contributed to that. Thank you for tirelessly working promoting MOBE's programs and constantly moving forward!

So this month we had **5 Six Figure earners**, here they are:

| | | |
|---|---|---|
| 1st | Mike Mike | $456,821.46 |
| 2nd | WeRunAds LLC | $248,537.87 |
| 3rd | Steven Bransfield | $177,976.48 |
| 4th | John Chow | $169,371.24 |
| 5th | Jim Ly | $137,015.74 |

Figure 1:  Excerpt from MOBE's daily email to affiliates (dated February 9, 2018).

29.    In turn, Defendants used their status as MOBE's top income earners to present themselves as trusted "advisors" to consumers.  Defendants then told consumers to purchase the MOBE memberships if they wished to use the very same methods that Defendants used to make substantial income online.

30.    Defendants used online advertisements, social media, email communications, and live events to proliferate the deceptive message that MOBE had a proven money making system and that MOBE would show consumers how to make "six or seven figure" incomes.

31.    Defendants created and disseminated misleading testimonials describing their own past financial or personal struggles, how MOBE enabled them to overcome those obstacles, and how anyone willing to invest their money with MOBE could start making substantial income quickly like Defendants had.

32.    Defendants told consumers that their "investment" in the MOBE program would pay for itself and that they would start generating substantial and steady income in the form of commissions after completing MOBE's 21-step program.

33.    Contrary to Defendants' claims, the vast majority of consumers who joined the MOBE program and purchased these memberships or mentoring services lost money.

34.     For example, in order to complete the 21-step program, MOBE required consumers to spend tens of thousands of dollars—at times up to $60,000 or more—on MOBE memberships.  According to MOBE's own income statement, the average purchaser of MOBE memberships (or MOBE "consultant") made only $700 a year.

35.     Despite consumers complaining that they were not making money after purchasing the MOBE memberships, Defendants urged consumers to continue on with the 21-step program and continue to upgrade their membership levels.

36.     Like MOBE, Defendants also promoted and sold costly mentoring services or leads lists, costing thousands of dollars more, to consumers who upgraded to the highest MOBE membership level.  Defendants represented that these additional services would enable consumers to quickly launch their MOBE business and start their income generation.

37.     In just over six years, the MOBE program bilked more than $300 million from consumers who purchased its products and services.  Over $30 million of this consumer harm is attributable to Defendants' conduct.

38.     As a result of Defendants' and MOBE's actions, many consumers have lost their retirement funds or life savings, lost their homes, and ended up with insurmountable credit card debt.

**B.      The Bransfield Defendants**

39.     Bransfield joined MOBE in 2015 to work as a marketing assistant.

40.     By 2016, Bransfield became an affiliate of MOBE and began promoting and selling MOBE's private mentoring services to consumers.

41.     MOBE billed Bransfield as one of McPhee's "handpicked" mentors who has "gone on to earn multiple six figures on his online business" and whose "goal is to help 10

people make their first $100,000 online by the end of 2017."

42.     By 2017, Bransfield and MOBE launched an advertising campaign and website called "Rookie Profit System."  The website targeted college-aged adults and consumers who lacked online marketing experience and used headlines such as "What Every Business Rookie Needs to Know … How A Baby-Faced 22-Year-Old College Dropout Just Crossed $1 Million With The 'Rookie Profit System":



Figure 4:  Excerpt of website rookieprofitsystem.com (captured January 19, 2018).

43.     Bransfield used deceptive testimonials to market the Rookie Profit System.  In one written testimonial, which he signed as "Steven Bransfield, The Freshman Million Dollar Earner," Bransfield narrates his story of when he was a broke college student and how he found a "*proven* system for making money" in MOBE and is living in his "dream home – a $2.9 million mansion in the Hollywood Hills."

44.     Bransfield also used over a dozen testimonials from other consumers or "rookies" who purportedly had made tens of thousands or hundreds of thousands of dollars after joining the Rookie Profit System.

45.     Bransfield claimed that he is "living proof" that a consumer with no online marketing experience can become a "million dollar earner" with MOBE and that "making 6-figures – $100,000 or more – is within anyone's reach."

46.     Bransfield claimed that after paying the one time application fee of $49, the consumer would get instant access to his Rookie Profit System where the "cash-generating process is simple" and "everything that happens after the lead is Don- For-You" (sic). Bransfield told the consumer that MOBE "is currently accepting new consultants who want to make life-changing amounts of money from home."

47.     When the consumer signed up and paid the $49 registration fee with Rookie Profit System, MOBE enrolled the consumer in its 21-step training course, where MOBE's sales agents induced consumers to buy MOBE memberships.

48.     Contrary to Bransfield's representations that joining the Rookie Profit System would enable consumers to make substantial income quickly and easily, consumers who joined MOBE through the Rookie Profit System and purchased the MOBE memberships did not earn substantial income.

49.     In addition to using the Rookie Profit System to direct consumers to MOBE's 21-step program, Bransfield also marketed and sold mentoring packages to MOBE membership purchasers.

50.     The Bransfield Defendants advised consumers who already spent tens of thousands of dollars on MOBE memberships to then purchase the MOBE mentoring services.

51.     The Bransfield Defendants claimed that the MOBE mentoring services would enable consumers to quickly launch their online marketing business and start generating

thousands of dollars in monthly commissions that consumers expected to receive from their initial investments in the MOBE memberships.

52.    In reality, many consumers who purchased the MOBE mentoring services failed to generate substantial income or recoup the costs of the mentoring services.

53.    For consumers who purchased the mentoring services, the Bransfield Defendants purported to supply them with their own sales process (called "IMF funnels"), which were primarily advertising campaigns that consumers would run on social media platforms such as Facebook to draw other social media users to attend MOBE's free live event—the "IMF" workshop.

54.    The syllabus for the mentoring services claimed that consumers can "expect 50 leads (name and email), 12-15 application forms, and 2-3 sales per day from this funnel."

55.    The Bransfield Defendants also directed consumers to their Facebook group pages—such as the "Steven Bransfield Facebook Fan Page" or the "Entrepreneurs Club"—to promote MOBE's mentoring services and live events and to increase the size of their social media following:



Figure 5:  Excerpt from Bransfield's PPT presentation "How to Profitably Run Facebook Ad Campaigns"

(dated Oct. 23, 2016).

56.     In Skype chats with consumers, Bransfield represented that his own team of mentors would show them "how to build a 6 figure and then 7 figure per year business," and that "it is impossible to scale to 7 figures without these exact strategies (no one has done this but me and my students in the past 2 years)."

57.     Bransfield claimed that his team would show consumers how to grow their online business in 90 days from "zero to $10,000 per month."

58.     On their websites, the Bransfield Defendants claimed to have "High Converting Sales Funnels Proven to Generate Thousands Of Customers For Our Clients" and that they have "done over $10 million in personal sales for entrepreneurs just like you!"

59.     In his marketing materials, Bransfield claimed that the mentoring services would enable consumers to "take a winning campaign and scale it to $650,000+" while preventing Facebook from shutting down their user accounts due to terms of service violations.

60.     The Bransfield Defendants charged consumers anywhere from $5,000 to $25,000—based on what the consumer was willing or able to pay—for their "set up" and "support" services.

61.     Contrary to these representations, the majority of consumers who purchased the MOBE mentoring services from the Bransfield Defendants have not made $10,000 in 90 days, made six figures within a year, or scaled their advertising campaigns to make $650,000 or more.

62.     Consumers discovered, after their purchase, that the fees they paid to the Bransfield Defendants would not even cover the costs of placing ads on Facebook or monthly

fees for using software that the Bransfield Defendants recommended or provided.

63.     Since he first joined MOBE in 2015, Bransfield received numerous complaints from consumers reporting that they have lost substantial amounts of money with MOBE.

64.     When confronted with these concerns, Bransfield told consumers that the MOBE mentoring services were "100% legit," that the mentorship program "is the best way to get results" and that "everyone who works with our team and is consistent gets results."

65.     The Bransfield Defendants frequently refused to issue refunds to consumers, claiming that their refund or cancellation requests were untimely.

66.     Instead of issuing refunds, the Bransfield Defendants advised consumers to try to recoup their mounting losses through "profitable solutions" that entailed spending more money on costly ad campaigns on Facebook or other social media.

67.     In March 2018, after learning of the FTC's suit against Digital Altitude— MOBE's direct competitor and copycat scheme—Bransfield asked MOBE to take down the Rookie Profit System from the internet.  Bransfield also asked MOBE to disable his MOBE email account and remove him from MOBE's internal Skype chats.

68.     While Bransfield sought to erase any traces of his direct association with MOBE at this time, the Bransfield Defendants—led by Bransfield—continued to promote and sell their "IMF funnel building" mentoring services to MOBE members.

69.     From April 2017 until June 2018, the Bransfield Defendants made over $4 million dollars in commissions from MOBE.

70.     During the time the Bransfield Defendants were promoting the MOBE mentorships, Bransfield also arranged to provide mentoring services to consumers that

purchased MOBE memberships from other top-ranking affiliates of MOBE.  In return, Bransfield received a percentage of these top-ranking affiliates' sales of these mentorships to consumers.

71.     After the FTC filed its action to shut down MOBE, the Bransfield Defendants diverted MOBE members to an e-commerce training program and offered a "brand new proprietary E-commerce training that is now available to you EXCLUSIVELY through your We Run Ads account."

**C.     Chow and TTZ Media**

72.     Chow joined MOBE as an affiliate marketer in late 2012 and soon thereafter claimed to be earning $50,000 per month through MOBE.

73.     Chow used various means to deliver his deceptive earnings claims about the MOBE program, including email campaigns, testimonials, webinars, live event presentations, user reviews, self-authored "eBooks," and his online blog sites called "John Chow Dot Com" and "Blogging with John Chow."

74.     Chow claims his blog pages have generated over 300,000 views per month from over 200,000 unique visitors and that they cater to "internet entrepreneurs, investors, tech heads, gears heads and interested consumers."

75.     Chow's blog pages and websites prompted these visitors to submit their e-mail information, which Chow then used to launch his mass email marketing campaigns to find prospective buyers for the MOBE memberships.

76.     In these mass marketing emails, Chow claimed that "MOBE is a great turnkey solution for anyone looking to make money online" because "you just drive leads and let the MOBE sales funnel and phone team follow up to close the sales for you."

77.    Chow repeatedly claimed in these emails that the MOBE program offered a 21-step system for "regular" people who are looking to make substantial income on the internet and who have "zero internet marketing experience."

78.    Chow claimed that MOBE is "my number one money maker and what I recommend most for anyone looking to make big income online … regardless of age, background, where you're from, or your experience level, you can do this business."

79.    Chow claimed that joining MOBE has allowed him to drive luxury cars "for free" and "buy a $2 million house for cash."

80.    Chow gave MOBE his highest endorsement and touted MOBE as "one of the most profitable systems I have ever worked with."  At the same time, Chow earned commissions from MOBE for promoting its 21-step program, live events, and membership offerings.

81.    Chow deceptively represented that consumers faced "ZERO risk" because joining the MOBE program only required a "$49 application fee" and consumers would be issued a "full refund" if "for any reason you don't think this is worth 10x the money."

82.    In collaboration with MOBE, Chow also launched an ad campaign called the "Ultimate Dot Com Lifestyle."  Like the Rookie Profit System, this ad campaign consisted of a website, a video testimonial from Chow, and a registration page directing consumers to join MOBE's 21-step system.

83.    Chow sent links to the "Ultimate Dot Com Lifestyle" website to his blog readers and followers.

84.    In the testimonial for Ultimate Dot Com Lifestyle, Chow claimed that he created this 21-step system with MOBE to help the willing "student" make monthly income

from the internet.  As Chow stated:  "This is a 21 step system I created with MOBE to help

you make your first $1,250, $3,300, $5,500, and even $10,000 online….   All you have to do

is follow the system and do what your coach advises."

85.     In the video testimonial, Chow purported to reveal the "World's Only 'Done

for You' Sales System That Deposits $1,250 … $3,300 … and $5,500 into Your Bank

Account":



Figure 6:  Excerpt of website ultimatedotcomlifestyle.com (captured on January 18, 2018).

86.     Chow claimed that "regular people all over the world are making thousands

… tens of thousands … even hundreds of thousands of dollars with this System every

MONTH" and "even people in their 80's are making money by following 21 simple steps."

87.     After consumers watched this video and registered for MOBE's 21-step

program, MOBE's sales agents would proceed to sell consumers the MOBE memberships.

88.     On the registration page for this website, Chow claimed that the MOBE

program was "100% risk free" and came with a 30-day money back guarantee.

89.    Chow also created and circulated an eBook titled the "Ultimate Online Profit Model – *The Ultimate Guide to Making Six-Figure Monthly Income on the Internet and Living The Dot Com Lifestyle*."  The eBook was a thinly veiled sales pamphlet that Chow used to convince readers to join the MOBE program, as illustrated below:



Figure 7: Cover page of Chow's eBook titled "The Ultimate Online Profit Model" (2018).

90.    Chow disseminated his eBook through his websites, through his mass marketing emails, and through other MOBE affiliates that Chow recruited into the MOBE program.

91.    Chow devoted the first half of his e-Book explaining his extensive experience with affiliate marketing and other online moneymaking opportunities.  In the second half of the e-Book, Chow introduced MOBE to the reader as the solution to consumers looking to make substantial income online.

92.    Chow claimed that the way to make "big money" as an affiliate online

marketer is by selling MOBE's products to other consumers.

93.    In the same vein as his mass marketing emails, Chow claimed in his eBook that the MOBE program offers "Twenty-one simple steps to making your first $1,250 online even if you have no computer skills whatsoever."  Chow told his readers that in order to achieve the "Dot Com Lifestyle," they needed to follow the 21-step program and "take action" by purchasing MOBE memberships.

94.    Chow also claimed that "MOBE is the only top tier direct sales company that has a phone team to do the selling for their licensees" and that the "phone team [has been]… responsible for more than half my MOBE income."

95.    Chow reminded consumers of his own "amazing" results:  generating tens of thousands of dollars in monthly income by promoting the MOBE program to others and achieving the "dream of living the Dot Com Lifestyle."

96.    For consumers that purchased the MOBE memberships through Chow's websites and email links, Chow offered to include their personal story—in the form of a written testimonial—in the foreword section of his eBook.

97.    Chow claimed that these testimonials would help consumers build their own list of willing buyers and enable them to generate commissions from MOBE.

98.    The forewords, which in numerous instances Chow wrote or revised, mostly served to highlight Chow's own purported achievements in internet marketing and reminded the reader to "take action" on Chow's recommendation in the eBook — *i.e.*, join the 21-step program and buy MOBE memberships.

99.    Chow published and disseminated hundreds of these eBooks with largely identical forewords from different consumers.

100.    Chow also promoted and sold MOBE memberships through his speaking engagements and presentations at live events hosted by MOBE.  MOBE paid Chow to speak at these live events to promote MOBE products and services.

101.    During his presentations, Chow delivered and reinforced the same message about MOBE that he conveyed through his ad campaigns, eBooks, blog posts, and video testimonials—that MOBE offered a rare opportunity for consumers to make substantial income online, whether or not they had any prior internet marketing experience.

102.    Chow presented consumers with one of two options—do nothing and make no money, or make a "small investment" in MOBE to take advantage of its investment opportunity that is 100% risk free and comes with money-back guarantees.

103.    Chow received 40% of MOBE's collections from attendees that purchased MOBE products or services promoted by Chow at these events.

104.    On several occasions, Chow also worked with Bransfield and promoted Bransfield's sales webpage—Rookie Profit System—to sell MOBE memberships.

105.    Chow would tell prospective buyers that the Rookie Profit System is the "perfect system for beginners" where "you don't have to build websites, and you don't need any marketing experience."

106.    Chow recorded video testimonials together with Bransfield to underscore the message that making money through MOBE was easily attainable to anyone.

107.    Contrary to Chow's repeated representations regarding earnings potential from MOBE, the vast majority of MOBE membership purchasers did not make the level of income that Chow claimed.

108.    In 2015, one consumer even asked Chow to explain the wild disparity

between Chow's exaggerated earnings claims and MOBE's sobering income statement indicating that the average MOBE affiliate made only $500 to $2000 a year. Chow deflected the consumer's question and stated: "It's not that the average income is $2000 a year. It's more like 80% make zero because they do nothing and 20% make six figures because they do the work. But the 80% making zero brings the average to $2k." Chow's claim that "20% make six figures" is also false and not supported by MOBE's income statement.

109.    On numerous occasions during the time period he was promoting MOBE, Chow received complaints and concerns from consumers reporting that the MOBE program was a scam or a fraud.

110.    In 2013, a consumer questioned Chow's promotion of MOBE: "I am surprised you support this, which is at best a misrepresentation and at worst outright FRAUD. The way it's written, one is lead [sic] to believe that all you have to do is pay $50 and do the 21 step program and if you don't make $1000 in [commission] in 30 days you get $500 back. I naively bought into this, paid the $50, but was told if I want to progress past step 6, I need to spend an additional $2000 on another affiliate program." This consumer complained that MOBE refused to provide him further access to the 21-steps unless the consumer purchased the entry level MOBE membership level for about $2,000. Chow responded: "this has made me rethink my promotion" of MOBE. Despite his response, Chow continued to promote and sell the same MOBE products to unsuspecting buyers over the next five years.

111.    In 2016, a consumer alerted Chow to numerous online complaints reporting that MOBE was a "scam." Chow responded by recommending the consumer to "apply, go through the 21 steps and connect with your coach" and, rather than rely on others' opinions, to "take control in your hands and find out yourself." Chow assured the consumer there was

no risk because the application fee was only $49 and "refundable."

112.    By 2016, Chow became aware of a growing number of consumer complaints posted on the internet about MOBE's business practices.  In his marketing emails, Chow advised prospective buyers to ignore these complaints and to try out the MOBE program and "find out yourself."

113.    To address the growing number of online complaints from people who lost money to MOBE, Chow directed prospective buyers to MOBE's "case studies"—unverified testimonials of select MOBE affiliates claiming to have made some commissions—as "proof" that "lots of people [are] making money" with MOBE.

114.    Although Chow repeatedly claimed the MOBE program was "risk free" and fully refundable for dissatisfied consumers, when consumers reached out to Chow for the refunds because MOBE was not responding to their requests, Chow disclaimed any responsibility for issuing the refunds.

115.    In numerous instances, Chow instructed the consumers to contact MOBE again to obtain the refund.

116.    In other instances, Chow even told consumers not to bother asking MOBE for refunds if consumers missed the 3-day cancellation deadline, which Chow failed to clearly disclose in his marketing materials and mass emails.  The 3-day cancellation period is provided in fine print in MOBE's post-purchase agreements.

117.    As a result of these deceptive acts and practices, Chow made over $4 million in commissions from MOBE and caused millions of dollars more in financial harm to consumers he deceived.

118.    After MOBE was shut down in June 2018, Chow promoted other investment

opportunity schemes.  On his blog pages and websites, Chow claimed he was an expert advisor on internet moneymaking opportunities and told his readers: "I Make Money Online By Telling People How I Make Money Online."  Chow disseminated eBooks, like those he used to promote MOBE, titled "The Ultimate Online Profit Model" that purported to reveal "The Secret to Making *Six-Figure Monthly Income* on the Internet."

### D.    Zuckman and Alpha Quad

119.    Zuckman joined MOBE in early 2015 as a speaker at MOBE's live seminars in the United States, including a 3-day event called the Home Business Summit ("HBS").

120.    In online advertisements, MOBE touted the HBS as the live event for "home business entrepreneurs" and claimed:  "You Will Leave This LIVE EVENT Knowing Exactly What You Need To Do To Make $100,000 In The Next 12 Months Using the Internet":



Figure 8:  Excerpt of website thehomebusinesssummit.com (captured on March 28, 2017).

121.    MOBE held HBS seminars once or twice a month in various cities in the

United States, including in Orlando and Miami.  When consumers attended HBS after paying $497 for the ticket, they were subjected to three full days of high-pressure sales tactics to buy MOBE memberships and mentoring services.

122.    In his promotional videos for MOBE, Zuckman claimed that MOBE's live events were training seminars that would teach "entrepreneurs" how to make money "involving funnels that cause people to get massive amounts of commissions on every sale, and our team does all the work."

123.    Zuckman led numerous HBS events as the primary speaker or "trainer." During his time with MOBE, Zuckman spoke at over fifty separate HBS events held across the United States.

124.    Zuckman regularly spoke before an audience of 20 to 40 people at each HBS seminar.

125.    Zuckman's primary responsibility as an HBS speaker was to convince the audience to buy MOBE's costly memberships and mentoring services.

126.    Under his live events speaker agreement with MOBE, Zuckman received a 10% commission on each sale made to attendees at the HBS seminars where he spoke. Under his separate affiliate agreement with MOBE, Zuckman also received a 40% to 50% commission on all sales to consumers that Zuckman referred to the MOBE program.

127.    On each day of the three-day HBS seminar, Zuckman replayed hours of video segments and pre-recorded testimonials from people purportedly making money with MOBE.

128.    Zuckman played one video segment called "How several 'non-guru internet marketers are on track to clear over $100,000 a year online."  As documented in the HBS

speaker's agenda, the purpose of this video was to overcome any concerns about buying the

MOBE memberships expressed by prospective customers that lacked prior internet marketing

experience.

129.    Zuckman played another video called "Going from your first 6 figures to your

first 7 figures," which he used to convey the false impression that average consumers were

earning millions of dollars with MOBE.

130.    Zuckman often explained to consumers that it was important to get in early on

the MOBE investment opportunity and to quickly upgrade their membership levels.

131.    Zuckman claimed that consumers who failed to upgrade their memberships

quickly would "pass up" the opportunity to earn substantial commissions.

132.    At an HBS event held in California, Zuckman related his personal story of a

time he missed out on substantial commissions because he neglected to immediately upgrade

his MOBE membership to the highest level upon joining MOBE:

> "So the key lesson from that is get positioned from day one for maximum
> profitability.  Let me show you some numbers just to kind of put this in
> perspective.  I gave you a goal yesterday that we were going to show you
> how to walk away knowing how to make $100,000 in 12 months.  So let's
> look at that as a goal…. Do you want to make 100,000 a year?  You sell
> 80 Silvers…. But what if you were positioned at Titanium instead of
> Silver?  The company's funnel is going to do work for you to get people
> upgrading, and typically you're going to get in the neighborhood of around
> 20 to 30 percent of Silvers will do Titanium.  I'm being conservative
> here…. But if you're a Diamond?  … Fifty.  It's a lot easier to sell 50 in a
> year than it is 80.  That's only four a month.  You can do that.  One a
> week."

133.    Towards the end of the 3-day HBS seminar, Zuckman advised consumers to

pay tens of thousands of dollars more for MOBE mentoring services fulfilled by the

Bransfield Defendants.  Zuckman claimed the mentoring services would enable consumers to

"fast track" their online business and their  MOBE commissions.

134.    MOBE and Zuckman spent little time at the HBS seminar teaching attendees the technical aspects of internet advertising and marketing.  Rather, Zuckman devoted a significant amount of time to going over the different ways that consumers could raise money to pay for their expensive MOBE products.  Zuckman referred to this segment of the HBS seminar as "funding sources for your business" and using "other people's money."

135.    During this segment, Zuckman proposed a variety of ways that consumers could borrow money, such as obtaining a home equity line of credit or a small business loan, or dipping into their children's education savings funds.

136.    Zuckman even presented mock scenarios on how to ask one's parents for money to invest in MOBE.

137.    At the HBS and elsewhere, Zuckman also distributed scripts for consumers to use with their banks to inquire about borrowing limits, opening up credit lines or raising existing credit limits, while avoiding a "hard" credit check.

138.    Zuckman provided these scripts so that consumers could pay for the costly MOBE memberships on their credit cards.

139.    Zuckman's presentations did not teach consumers how to pay off the mounting debts that consumers would incur after their HBS training was over.

140.    Rather, Zuckman sent follow up emails to consumers to falsely assure them that the commissions they would earn from MOBE would be "way more than enough to totally pay back ALL of your credit cards you used PLUS you will be money ahead in commissions and well on your way to all of your goals.  All without any money put of your own pocket."

141.    Similarly, Zuckman convinced consumers to take money out of their retirement accounts because they would purportedly make it back with interest: "Your current 401K money isn't enough to retire on.  You should invest it in MOBE and triple/quadruple it."

142.    Zuckman often referred consumers to third party entities whose objective was to "assist" consumers in withdrawing money out of their retirement accounts or opening new credit lines in exchange for a "consulting" fee.  Zuckman received commissions from these third parties for referring MOBE members to their services.

143.    Zuckman even furnished consumers with false and unsubstantiated earnings data to assist consumers in obtaining loans to purchase the MOBE memberships.  In one email to a consumer applying for a small business loan to finance his MOBE membership purchase, Zuckman told the consumer that the sales conversion rate at HBS events was traditionally 25% to 50%.

144.    Zuckman did not make any mention of MOBE's actual earnings data revealing that the average MOBE member only made $700 per year in commissions.

145.    Zuckman routinely made misrepresentations to close the sale on MOBE memberships or to dissuade consumers from cancelling their purchases within the 3-day cancellation period.  For example, one consumer informed Zuckman that she decided against investing in a MOBE membership due to her visa status, which prohibited the consumer from earning income through an internet business.  Zuckman advised the consumer to set up a shell company because that would help conceal her prospective MOBE commissions from the Internal Revenue Service.  As Zuckman stated: "You can switch to company name and do business under that.  Therefore, it would not affect your green card in any way … now

that you know this, there is no reason to delay."

146.    When another consumer tried to cancel her MOBE mentorship within three days of her purchase so that she could use the money to buy a house, Zuckman advised the consumer "to reconsider your cancellation" because she and her husband were approved for "$200,000 in financing so you definitely CAN afford to do this business and still get your home."  Zuckman further claimed:  "In fact the financing can also be used for your home if you wish!  It can cover your down payment among other things.  Whatever other things you have going on….  NOTHING will work this well.  Also, you have a Mentor that is going to do this for you and teach you as well.  DO NOT QUIT!!!"

147.    Zuckman told another consumer who exhausted her credit limit and who was in immediate need of money to help a dying family member and advised her not to seek chargebacks on her MOBE purchases.  Zuckman told the consumer:  "You should not ask the credit card companies to reverse the charges as you would be losing any chance of achieving your own financial goals and dreams … For now, I am sure there are other ways to raise funds to help your brother."

148.    Zuckman referred consumers to those who canceled their MOBE purchases as "quitters" and people who failed to "keep [their] commitments."

149.    Contrary to Zuckman's claims that consumers who purchased MOBE memberships and mentorships would make substantial income, including $100,000 in 12 months, most consumers did not make money from these purchases and in fact suffered substantial losses.

150.    Zuckman frequently received complaints and pleas from consumers who failed to achieve the income results that Zuckman claimed they would.

151.    Zuckman lured hundreds of consumer victims into the MOBE scheme and made millions of dollars as a result.  Zuckman has used his corporate shell, Alpha Quad, to collect his MOBE commissions.

152.    After MOBE was shut down, Zuckman promoted other business coaching programs and investment opportunities.  Through his company Alpha Quad, Zuckman offered business education seminars to "entrepreneurs" and claimed that his company was "one of the front runners in providing a galaxy of courses to the entrepreneurs and investors looking forward to increase their wealth in the future."

153.    Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:  Defendants engaged in their unlawful acts and practices repeatedly over a period of three to six years; Defendants engaged in their unlawful acts and practices willfully and knowingly; Defendants continued their unlawful acts or practices despite knowledge of numerous complaints about MOBE, and even after a federal court shut down a copycat scheme called "Digital Altitude" in February 2018 (*see FTC v. Digital Altitude*, No. 18-cv-00729 (C.D. Cal. Feb. 1, 2018)); Defendants stopped their deceptive sale and marketing of MOBE products only after the Court shut down MOBE in June 2018; Defendants continued to sell or promote similar business coaching or investment opportunity schemes after MOBE was shut down; and Defendants participated in the coaching or affiliate marketing business and maintain the means, ability and incentive to resume their unlawful conduct.

## VIOLATIONS OF THE FTC ACT

154.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

155.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### COUNT I
### Misrepresentations Regarding Earnings
### (as to all Defendants)

156.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of MOBE-related products or services, Defendants have represented, directly or indirectly, expressly or by implication, that purchasers of those products or services would earn or were likely to earn substantial income.

157.     Defendants' representations set forth in Paragraph 156 of this Complaint are false, misleading, or were not substantiated at the time the representations were made.

158.     Therefore, Defendants' representations set forth in Paragraph 156 of this Complaint constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

159.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

160.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to stop and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

## PRAYER FOR RELIEF

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act by Defendants;

B.    Find Defendants jointly and severally liable for redress to all consumers who were injured as a result of their violations, as appropriate;

C.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

ALDEN F. ABBOTT
General Counsel

Dated:  March 3, 2020

_____
Sung W. Kim (Trial Counsel)
Benjamin R. Davidson  (Trial Counsel)
Federal Trade Commission
600 Pennsylvania Ave., NW, Mailstop CC-8528
Washington, DC 20580
Kim:  (202) 326-2211; skim6@ftc.gov
Davidson:  (202) 326-3055; bdavidson@ftc.gov
Fax:  (202) 326-3395

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION